1   GABRIEL A. JACKSON, State Bar No. 98119
     Email: gajackson@jjr-law.com
2   JAMES J. O'BRIEN, State Bar No. 238534
     Email: jbrien@jjr-law.com
3   JACKSON JENKINS RENSTROM LLP
     55 Francisco Street, 6th Floor
4   San Francisco, CA  94133
     Tel:   415.982.3600
5   Fax:  415.982.3700

6   Attorneys for Defendant
     GENERAL DYNAMICS CORPORATION
7

8             **UNITED STATES DISTRICT COURT**

9        **EASTERN DISTRICT OF PENNSYLVANIA**

10

11  CHARLES AIKINS,                MDL DOCKET NO. 875

12        Plaintiffs,           Case No. 2:10-cv-64595-ER

13      v.

14  GENERAL ELECTRIC COMPANY, et    **MEMORANDUM OF POINTS AND**
     al.,                          **AUTHORITIES IN SUPPORT OF**
15                          **DEFENDANT GENERAL DYNAMICS**
           Defendants.         **CORPORATION'S MOTION FOR**
16                          **SUMMARY JUDGMENT OR, IN THE**
                           **ALTERNATIVE, SUMMARY**
17                         **ADJUDICATION OF CERTAIN ISSUES**

18                       Date:  TBD

19                       Time:  TBD

20                       Courtroom:  Hon. Eduardo Robreno

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION

II.     UNDISPUTED MATERIAL FACTS ................................................................. 2

    A.   Plaintiff's Claims for Negligence and Strict Liability ........................... 2

    B.   Factual Discovery.................................................................................. 2

    C.   General Dynamics's Status as a Government Contractor ....................... 3

        1.   Control by the US Navy over the Design and Construction of Naval Vessels ..................................................................................... 3

        2.    Asbestos in the US Navy .......................................................... 5

        3.   Written Materials Regarding Equipment Supplied to the Navy ................ 7

        4.   The Navy's Knowledge Regarding the Hazards of Asbestos ..................... 9

    D.   Plaintiff's Claim for Punitive Damages ............................................... 10

III.    LEGAL ARGUMENT .................................................................................... 11

    A.   The Summary Judgment Standard ....................................................... 11

    B.   General Dynamics is Entitled to Summary Judgment Because There is No Evidence That Plaintiff was Ever Exposed to Asbestos by a Product for Which General Dynamics is Responsible ............................................. 11

        1.   It is Plaintiffs' Responsibility to Show That Plaintiff Was Exposed to an Asbestos-Containing Product for Which General Dynamics is Responsible ................................................................................ 11

        2.   Plaintiffs Have Failed to Provide Sufficient Evidence That Plaintiff Was Ever Exposed to Asbestos From a Product for Which General Dynamics is Responsible ........................................................... 12

        3.   Without Evidence That Plaintiff Was Exposed to Asbestos From a Product for Which General Dynamics is Liable, Plaintiffs Cannot Establish Causation, and Thus All of their Claims Against General Dynamics Fail as a Matter of Law. ........................................... 12

            a.   Plaintiffs Must Prove "Threshold Exposure" to a Defendant's Allegedly Defective Product Before Causation Can Be Established ............................................................ 12

            b.   "Threshold Exposure" is Established With Evidence of the Time, Location, and Circumstances of the Alleged Exposure ...... 13

            c.   Plaintiffs Do Not and Cannot Obtain Evidence to Establish "Threshold Exposure" ................................................... 14

            d.   Plaintiffs Cannot Establish that the Exposure Was a "Substantial Factor" in Causing Plaintiff's Injuries..................... 14

    C.   General Dynamics is Entitled to Summary Judgment Because Its Status as a Government Contractor Immunizes it From Liability for Actions Taken at the Behest of the United States Government .................................... 15

        1.   The United States Approved Reasonably Precise Specifications for the Ships it Procured from General Dynamics ........................... 16

i

# TABLE OF CONTENTS
## (continued)

Page

2. General Dynamics' Vessels Conformed to U.S. Navy Specifications...... 18

3. The Hazards of Asbestos Were Known to the United States Navy; It was a Leader in Researching Asbestos Health Hazards ........................... 18

D. The United States Navy was a Sophisticated User of Asbestos............................ 19

E. Plaintiffs Have Not Provided Any Evidence Showing That He Is Entitled To Punitive Damages In This Action.................................................................... 20

IV. CONCLUSION ............................................................................................................. 20

GENERAL DYNAMICS CORPORATION'S SPECIAL INTEROGATORRIES (SET ONE)

**TABLE OF AUTHORITIES**

Page

**Cases**

Adickes v. S.H. Kress & Co.
   398 U.S. 144, 158-160, 90 S.Ct. 1598, 1608 -1609 (1970) ...................... 11

Beal Bank, SSB v. Pittorino
   177 F.3d 65, 68 (1st Cir. 1999) .................................................................. 11

Boyle v. United Technologies
   (1988) 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 ......... 15, 16, 17, 18

Butler v. Ingalls Shipbuilding Co.
   89 F.3d 582, 584 (9th Cir. 1996) .............................................................. 16

Celotex Corp. v. Catrett
   477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986) ................................. 11, 12

City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.
   838 F.2d 268, 273 (8th Cir. 1988)............................................................ 12

Dumin v. Owens-Corning Fiberglas Corp.
   (1994) 28 Cal.App.4th 650 ...................................................................... 12

Eastern and Southern Districts Asbestos Litigation
   772 F. Supp. 1380, 1384 (E.D.N.Y. 1991)............................................... 19

Johnson v. American Standard, Inc.
   (2008) 43 Cal.4th 56 ................................................................................ 19

Niemann v. McDonnell Douglas Corp.
   721 F.Supp.1019 (S.D. Ill. 1989).................................................... 16, 17, 19

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.
   210 F.3d 1099, 1102 (9th Circ. 2000) ...................................................... 11

Ramey v. Martin-Baker Aircraft and McDonnell-Douglas Corp.
   874 F.2d at n.10.......................................................................................... 18

Related Asbestos Cases .....................................................................................
   (N.D. Cal, 1982) 543 F.Supp. 1142 ......................................................... 19

Russ v. International Paper Co.
   943 F.2d 589, 592 (5th Cir. 1991)............................................................ 12

Rutherford v. Owens-Illinois, Inc.
   (1997) 16 Cal.4th 953 .................................................................... 12, 13, 14

Schroeder v. San Diego Unified Sch. Dist
   2009 U.S. Dist. LEXIS 40422 at *45 (2009) .......................................... 20

Shuman v. United States,
   1st Cir. 1989) 765 F.2d 283 ..................................................................... 18

Smith v. Wade
   461 U.S. 30, 46-47; 103 S. Ct. 1625; 75 L. Ed. 2d 632 (1983) ............... 20

Smith v. Xerox Corp.
   866 F.2d 135, 139 (1989).......................................................................... 17

United States v. Varig Airlines
   467 U.S. 797, 814 (1984) .......................................................................... 15

Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.
   860 F.Supp. 1448, 1450 (CD CA 1993) .................................................. 11

Wanland v. Los Gatos Lodge, Inc.
   (1991) 230 Cal.App.3d 1507..................................................................... 14

Yeroshefsky v. Unisys Corp.
   962 F.Supp. 710, 719 (1997)..................................................................... 17

**Statutes**

28 U. S. C. § 1346(b) ....................................................................................... 15

28 U. S. C. § 2680(a) ....................................................................................... 15

iii

1

# TABLE OF AUTHORITIES
### (continued)

2
**Page**

3   **Other Authorities**
Rest.2d Torts, § 402A ........................................................................................... 19

4   **Rules**
FRCP Rule 56(a),(b) ........................................................................................... 11
5   FRCP Rule 56(c) ................................................................................................ 11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POINTS AND AUTHORITIES SUPPORTING GENERAL DYNAMICS CORPORATION MSJ/MSA

# I.

## INTRODUCTION

Defendant General Dynamics Corporation/General Dynamics Corporation (hereafter "General Dynamics") respectfully submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment or, in the alternative, Partial Summary Judgment on the issue of Punitive Damages.

Plaintiffs' claims are barred because General Dynamics, a private contractor engaged by the United States Navy to build military vessels, is immune from suits arising from injuries caused by those vessels.  Plaintiffs' claims against General Dynamics exclusively concern its manufacture or repair of ships for the United States Navy.  General Dynamics has provided the expert testimony of Admiral Roger Horne and Admiral Sargent to show that:

(1)  The United States approved reasonably precise specifications for the equipment in question;

(2)  General Dynamics' equipment conformed to those specifications; and

(3)  The U.S. Navy knew about the hazards of asbestos at the time General Dynamics supplied the equipment.

This showing entitles General Dynamics to government contractor immunity from Plaintiffs' lawsuit and a concomitant grant of its motion for summary judgment. As will be demonstrated, the United States government and the Department of the Navy at all times maintained superior knowledge of the hazards of asbestos and was a sophisticated user of asbestos-containing products.

Finally, while Plaintiffs seek punitive damages from General Dynamics, such damages may only be imposed upon a showing of General Dynamics' malice, oppression, or reckless indifference.  Despite ample opportunity to do so, Plaintiffs have failed to show such malice, oppression, or reckless indifference by General Dynamics especially given that, as Admiral Horne discusses, the equipment in question conformed to very specific U.S. Navy design requirements.

1

## II.
## UNDISPUTED MATERIAL FACTS

**A.     Plaintiff's Claims for Negligence and Strict Liability**

Plaintiff has complained against General Dynamics for Negligence and Products Liability (See Plaintiff's Complaint attached to the Declaration of James J. O'Brien ("O'Brien Decl.") as Exhibit "A," at pp. 1:24-14:4; see also Defendant's Answer to Plaintiff's Complaint attached as Exhibit "B" to the O'Brien Decl.). Plaintiff has also requested the imposition of exemplary and punitive damages. (See Exhibit A). Generally, Plaintiff alleges that he was exposed to a hazardous level of asbestos on board ships that General Dynamics either manufactured or repaired, and that General Dynamics should be held liable for that exposure.

**B.     Factual Discovery**

Through its request for responses to Special Interrogatories, General Dynamics requested Plaintiffs to "state all facts" regarding their contention that Plaintiff worked aboard any ship repaired by General Dynamics. (See Plaintiff's Response to Defendant's Special Interrogatories, Set One, attached to the O'Brien Decl. as Exhibit "C," at Special Interrogatory No. 2, pp. 2:3-4:28). In response, Plaintiffs allege that Mr. Aikins was exposed to Defendant's asbestos-containing products aboard the USS FORT FISHER (LSD-40), USS KANSAS CITY (AOR-3), the USS KILAUEA (AE-26), and the USS WICHITA (AOR-1) between the years 1972-1995 while employed with the US Department of Defense for the Supervisor of Shipbuilding Offices (SUPSHIPS). (See Exhibit C at Special Interrogatory No. 8, pp. 10:7-18:3; see also Affidavit of Admiral Roger B. Horne attached to the O'Brien Decl. as Exhibit "D" at ¶¶ 1-11, 28). As a ship surveyor / inspector with SUPSHIPS, Plaintiff's duties included assuring that the work on the above ships was done in accordance with the government's specifications. (Id.). However, Plaintiffs have not provided any evidence that Mr. Aikins was exposed to asbestos as a result of his responsibilities at SUPSHIP or as a result of General Dynamics' responsibilities with respect to the construction or maintenance of any of the aforementioned ships. ( Id.; see also pertinent portions of Plaintiff's Deposition Testimony, Volume III, March 25, 2011, pp. 442:10-491:10).

2

Finally, when asked to identify documents to support his claims against General Dynamics, Plaintiff generally identified ship documents in the US National Archives & Records Administration located in College Park, MD relating to the ships at issue herein.  (See Exhibit C at Special Interrogatory No. 9, pp. 18:8-20:23).

C.      **General Dynamics's Status as a Government Contractor**

1.      Control by the US Navy over the Design and Construction of Naval Vessels

In general, with regard to government control, the material for a ship such as those in this case would have fallen into two categories-governments furnished and contractor (shipyard) furnished.  Government Furnished Equipment (GFE) would have been purchased directly by the government and provided to the shipbuilder; whereas, Contractor Furnished Equipment (CFE) was purchased by the contractor. All items, government and contractor-furnished, would have had to conform to the military specifications invoked at the time.  If construction was at a Navy Yard, the Navy was directly involved in assuring the specifications were followed. In a private yard, it would have been the responsibility of the local Supervisor of Shipbuilding in the area of construction or repair to inspect and verify that the material purchasing documents, the received material, and the ship repair or construction itself all conformed to the specifications.  The Supervisor had to follow the requirements specified or get formal waivers to the specifications of interest from the Bureau of Ships. It was Mr. Aikins' job, when assigned to a Supervisor of Shipbuilding Office, to see this procedure was carried out.  It was through these means the Navy had assurance their ships met the rigorous requirements of wartime vessels.  (See Exhibit D at ¶ 12).

With further regard to government control, the Navy chain-of-command concerning ship construction involves several layers of authority related to technical and contractual control over Navy shipbuilding.  The Secretary of the Navy has ultimate authority over the Navy and Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of NAVSEA (Naval Sea Systems Command), is the Chief of Naval Operations (CNO), to whom NAVSEA reports.  Prior to the establishment of NAVSEA, the Bureau of Ships (BUSHIPS) controlled all combat ship design and construction and reported to the CNO as well as a civilian

3

1    Assistant Secretary of the Navy. (See Exhibit D at ¶ 13; see also Affidavit of Admiral David P.

2    Sargent attached as Exhibit "E" to the O'Brien Decl., at ¶¶ 54-65).

3          Since the creation of NAVSEA, NAVSEA reports to the CNO for all military ship design

4    and construction. Under the command of NAVSEA, as was the case with BUSHIPS, the Navy's

5    shipbuilding structure was comprised of several divisions and levels of authority concerning ship

6    design, construction, repair and inspection.  The Commander of Naval Sea Systems and the

7    Commander of Naval Supply directed technical and contractual control over shipboard

8    construction, as well as, equipment and material.  Each of these two organizations had oversight

9    responsibility concerning, among other things, equipment built for Navy vessels, as well as, the

10   Naval vessel itself.  Compliance with the standards and specifications required for ships and

11   equipment built for Navy use was directly monitored by naval machinery inspectors under both of

12   these divisions. At times, the machinery inspectors under Naval Supply worked on-site at the

13   vendors' manufacturing facility for equipment, and the Supervisor of Shipbuilding (reporting to

14   BUSHIPS) had Navy inspectors, such as Mr. Aikins, that carried out their inspection and

15   contractual responsibilities at the shipbuilding and repair yards. Inspectors within the Supervisor

16   of Shipbuilding offices would report to their superiors any violations or failures to comply with

17   specifications.  (See Exhibit D at ¶¶ 14-15).

18         The Navy used comprehensive plans, specifications and requirements invoked by

19   contract that governed the construction of the ship and the equipment placed in it.  The Navy had

20   general specifications and detailed specifications, as well as contract plans that were invoked by

21   contract. The general and detailed specifications and contract plans also invoked more detailed

22   specifications for the ship design, as well as, for the equipment and material to be used in its

23   construction.  Frequently, the more detailed specifications and contract plans noted above would

24   invoke even further specifications so that a shipbuilder had to comply in all aspects of the

25   construction.  Such direction also included material referenced in the plans and stocked by the

26   Navy. Such detailed requirements for the construction, maintenance, and operation of warships

27   and auxiliaries are necessary.  Navy ships were (and are still) being built to operate in combat

28   zones and are to be maintained with material specified by the Navy and stocked by the Navy.

4

1  Adherence to specifications was and is mandatory - lives depend on it. (See Exhibit D at ¶ 16).

2  Ships built in Navy and private shipyards were built in accordance with the plans and

3  specifications provided by the Navy.  Also, all the Supervisor of Shipbuilding Offices inspecting

4  Navy ships and other contracts reported to their superiors.  Such a relationship and reliance on

5  Navy constructing yards and Supervisor of Shipbuilding offices to assure specifications were

6  being followed. (See Exhibit D at ¶ 17).

7      It should be easy to understand that the Navy retained the "final say" over the design

8  attributes of naval ships and their equipment. As the purchaser, and having the engineering and

9  experience as to what was needed for a naval combatant vessel, the Navy retained final

10  responsibility for the ultimate decision regarding how to resolve any disagreement between the

11  Navy and a shipbuilder or an outside equipment supplier. In the case of private yards, the

12  Supervisor of Shipbuilding Office provided the link between the shipbuilder and BUSHIPS in

13  settling any disputes over Navy requirements. If Navy specifications were not followed by the

14  shipbuilder, the Supervisor's inspectors would reject the shipbuilder's involved work. All such

15  disputes were handled formally and any changes required change orders to the contract or formal

16  waivers to the specifications.  (See Exhibit D at ¶ 18).

17      Considering the above, any and all work performed in the construction and repair of Navy

18  ships, as well as, the equipment built and supplied for the ships was performed to requirements

19  developed and specified by the Navy.  Further, such work was typically reviewed and inspected

20  by Navy personnel in the vendors' plants and in shipbuilding and repair yards.   Such rigid

21  conformance to requirements was absolutely necessary for the construction of a warship which

22  was to take our sailors in harm's way.  (See Exhibit D at ¶ 19; see also Exhibit E at ¶¶ 7-35).

23      2.     Asbestos in the US Navy

24      Due to the importance of heat transfer and insulation in Navy propulsion plants and

25  aboard Navy vessels more generally, the Navy maintained significant expertise in these areas.

26  The BUSHIPS manual and other documents issued and continuously updated by the Navy

27  contained detailed instructions for the insulation by Navy shipyards or private contractors of

28  various systems and equipment, including, primarily, the miles of piping associated with thermal

1    systems aboard vessels. The Navy's specifications provided detailed instructions as to the specific

2    insulating materials to be used, and also as to the amounts of those materials and the manner in

3    which they were to be applied. (See Affidavit of Admiral David P. Sargent attached as Exhibit

4    "E" to the O'Brien Decl., at ¶¶ 36-38).

5        The Navy's dictation of the methods and materials for insulation of thermal systems took

6    various forms. As noted above, these included serial iterations of the BUSHIPS Manual's Chapter

7    39 on "Thermal Insulation." The Navy also prepared and imposed upon Navy design engineers

8    General Specifications for Machinery for Vessels of the United States Navy. Beginning in 1962,

9    the Navy began issuing a Military Standard intended to amplify the general requirements for

10   insulation of piping, machinery, uptakes, and mechanical equipment covered in the General

11   Specifications for Ships of the U.S. Navy or in ships specifications.  The Navy and/or its design

12   agents prepared for the builders of Navy vessels detailed drawings and plans showing the precise

13   methods and materials for insulation of various systems and equipment. Those documents

14   implemented the overall requirements of the General Specifications, and they provided the actual

15   instructions to the personnel applying insulation. The Insulation and Lagging Schedules included

16   details on the materials to be used, the thickness, installation procedures, and finishing details for

17   tons of thermal insulation materials to be applied by Navy and private shipyards. Once the Navy

18   selected a construction shipyard, that shipyard was required to comply strictly with all Navy

19   specifications, plans and drawings in the application of insulation and lagging to systems and

20   equipment aboard Navy vessels.  (See Exhibit E at ¶¶ 41-42).

21       Thus, the use of asbestos in thermal insulation allowed the Navy to design and field

22   propulsion systems that met the demanding war fighting requirements. The importance of

23   asbestos to Navy warships is attested to by the fact that it was assigned a high priority in the U.S.

24   government's critical materials allocation process. Asbestos was in short supply during World

25   War II, and its use was controlled through the War Production Board. A very large percentage of

26   asbestos was allocated to the needs of the Navy and U.S. Maritime Commission for use in

27   insulation for ship construction.  Manufacturers of components were not consulted by the Navy

28   with respect to insulation of their equipment and had no control over the types and quantities of

6

insulation products to be used in conjunction with their equipment.  Nor could they even be

certain whether or not any insulation would, in fact, be applied to their equipment. Above and

beyond the tens or hundreds of tons of thermal insulation used, other asbestos materials were

ubiquitous aboard Navy vessels pursuant to Navy specifications and requirements. (See Exhibit E

at ¶¶ 43-46).

3.    Written Materials Regarding Equipment Supplied to the Navy

Technical specifications referenced in the procurement documents for equipment have,

since at least the 1940s, included detailed requirements regarding all written materials supplied

with the equipment. Manufacturers were required to supply drawings and plans, and at times draft

technical manuals for equipment. The applicable specifications included strict instructions

regarding the labeling of and packaging of the components themselves, and for all technical

documentation that was procured with them.   The Navy had precise specifications as to the

nature of any markings, communication or directions affixed to or made a part of any equipment

supplied by Original Equipment Manufacturers (OEMs) for ultimate use aboard Navy ships.

OEMs, would not have been permitted, under the specifications, associated regulations and

procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any

respect from the Navy specifications in supplying equipment, including affixing any type of

warning or caution statement to equipment intended for installation in a Navy ship, beyond those

specifically required by the Navy without prior discussion and express approval by the Navy.

(See Exhibit E at ¶¶ 47-48).

The Navy had precise specifications as to the nature of written materials to be delivered

with equipment supplied by OEMs to the Navy. This written material included a variety of

formats such as design drawings, system schematics as well as operator reference materials to

assist the equipment operators in operating, servicing and maintaining such equipment and to

assist the Navy training establishment to develop instructional materials and courses. These

operator reference materials are and were generically known as "instruction books", "technical

manuals" or "service manuals". Typically, the Navy required these "instructional manuals" for

equipment that required operator involvement in start-up, operation, and shutdown. Through

7

1   specifications, the Navy required that certain equipment be supplied with a defined number of

2   copies of one or more instruction books or technical manuals. The Navy typically developed these

3   technical manuals by including development of a draft manual as part of equipment procurement

4   contracts. The draft manuals were required to be submitted to the Navy for detailed review and

5   feedback. Once the draft manuals were found to be acceptable to the Navy, a BUSHIPS number

6   was assigned and the manual became an official BUSHIPS document the contents of which were

7   controlled by the Navy. The term "manufacturer's instruction books" that is found in many Navy

8   rate training manuals refer to these Navy developed and approved technical manuals. (See

9   Exhibit E at ¶ 49).

10      Navy personnel participated intimately in the preparation and review of these instruction

11  books and technical manuals in a standardized format used by the Navy. These manuals included

12  safety information to the extent – and only to the extent – directed by the Navy. Manufacturers of

13  components and equipment were not permitted, under the specifications, associated regulations

14  and procedures, nor under the actual practice as it evolved in the field, to include any type of

15  warning or caution statement in instruction books or technical manuals, beyond those required

16  and approved by the Navy without prior discussion and approval by the Navy. The Navy dictated,

17  reviewed and approved the contents of all technical manuals, including any cautionary language

18  or emphasis. The Navy approached this process for review and approval of technical manuals in

19  an exacting manner. It often created lengthy memoranda detailing word-by-word line edits to the

20  content of technical manuals submitted for approval, including the wording of instructional

21  material and warnings.  The information provided with regard to equipment had to be consistent

22  with the Navy's overall evaluation of the appropriate types and level of information its personnel

23  required to efficiently perform their job responsibilities. (See Exhibit E at ¶¶ 50-51).

24      Uniformity and standardization of any communication, particularly safety information, are

25  critical to the operation of the Navy and Navy ships. The Navy could simply not operate safely

26  and effectively if personnel were trained differently, using inconsistent information received from

27  different manufacturers. If every equipment, structural steel and pipe manufacturer were allowed

28  to decide on the need for, and provide its own safety and heath warnings (including those

8

concerning asbestos insulation that might be used on or around its product), inconsistent warnings would certainly have resulted. If each were to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances. Therefore, the Navy's detailed specification of what warnings were required, both on equipments and in technical documentation, was logical and necessary.  The Navy would not have permitted equipment suppliers to place asbestos-related warnings on packaging or containers for equipment or related parts or items supplied during the 1940s through at least the 1970s. Similarly, the Navy would not have permitted equipment suppliers to place asbestos-related warnings in any literature or documentations supplied with equipment for Navy ships in the 1940s through the 1970s.  No private contractor, such as General Dynamics, could have affixed a written warning anywhere aboard an active duty Naval warship during its construction or repair, advising the risk of asbestos exposure. To do so without the Navy's express approval would be a deviation from the detailed and specific instructions mandated by the Navy. The Navy's detailed specifications did not leave room for individual vendors to make determinations about inclusion of asbestos warnings.  (See Exhibit E at ¶¶ 51-53; see also Exhibit D at ¶¶ 20-23).

    4.    The Navy's Knowledge Regarding the Hazards of Asbestos

The Navy maintained a Medical Department, which had the mission of "promotion of physical fitness; prevention and control of disease and injuries; and treatment and care of the sick and injured." As explained on Page 275 of The Human Machine: Biological Science for the Armed Services, a 1955 Naval Institute textbook that was incorporated into the curriculum during my time at the United States Naval Academy, "In order to fulfill [its] responsibility[,] the Medical Department is actively concerned with all phases of life in the Navy and advises all components of the Navy on matters which may affect the health and well-being of naval personnel." (See Exhibit D at ¶ 24).

The Navy Medical Department maintained a central administrative organization known as the Bureau of Medicine and Surgery ("BUMED"). Among BUMED's many functions was a responsibility to conduct research to "assist in the development of new equipment, new and better

9

methods of care and treatment of various diseases and injuries; help in the problem of adjustment of naval personnel to all of the new and strange environmental situations in which they are placed; and, in general, provide the knowledge necessary for the more efficient operation of the Navy. BUMED's research was "extremely broad and parallels the total activity of the Navy." Exhibit "B," page 277. (See Exhibit D at ¶ 25).

In dealing with asbestos, the Navy also conducted its own training, adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate. For example, page 31 of a 1950 General Safety Rules Manual issued by the Puget Sound Naval Shipyard instructed workers to "[w]ear dust type or air-fed respirators for ... handling amosite [asbestos] insulating materials ... . " A true and correct copy of this document is attached hereto as Exhibit "C". Pages 25 and 26 of a 1961 Marine Pipe Covering and Insulating Manual for Puget Sounds similarly set forth "General Safety and Health Practices," including instructions to "[h]andle amosite ... materials carefully to avoid [its] dust []," "sprinkle amosite with water whenever possible to keep dust down," and "[s]ee that your chest is x-rayed at least once a year to detect the possibility of ... asbestosis." Notably, the basic Naval Academy textbook, The Human Machine, referenced above, discussed the fact that "[t]here are dusts and vapors which cause injury and occasionally death. For example, dust causes such diseases as silicosis, anthrocsis, and other diseases due to the inhalation of such materials as asbestos dust, iron dust, tobacco dust, etc." See Exhibit "B" at pp. 85-86.  (See Exhibit D at ¶ 26).

In February 1971, NAVSHIPS issued Instruction 5100.26, providing a clear example of the Navy's having taken affirmative steps to implement a detailed and comprehensive plan for controlling asbestos hazards.  Exhibit "E" set forth  the dozens of steps to be taken to reduce or eliminate exposure to asbestos from materials in use aboard Navy vessels and in other Navy facilities. Additional instructions were issued thereafter by various Navy departments as the Navy continued to refine its procedures for handling of asbestos-containing materials and preventing asbestos exposure. (See Exhibit D at ¶ 27-28).

**D.**     **Plaintiff's Claim for Punitive Damages**

Despite many opportunities to do so, Plaintiff has not provided any evidence during the

10

discovery portion of this case indicating that Defendant behaved in a malicious, oppressive, or recklessly indifferent manner toward him or anyone else.  As noted above, Defendant built the ships at issue in accordance with U.S. Navy specifications and pursuant to U.S. Navy rules; it is difficult to see how manufacturing ships for the U.S. Navy that conform to the U.S. Navy's specific requirements could be considered "malicious, oppressive, or recklessly indifferent." Indeed, Plaintiffs' discovery responses contain no evidence that would entitle Plaintiffs to punitive damages. (See Exhibit C at pp. 1:24-52:15).

### III.
### LEGAL ARGUMENT

**A.**      **The Summary Judgment Standard**

A motion for summary judgment provides a procedure for immediately terminating actions in which there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FRCP Rule 56(c).  A motion for summary judgment "pierces" the pleadings and requires an opponent to affirmatively come forward with sufficient evidence for its claims or defenses to create a genuine issue for trial.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554-55 (1986). Upon a showing that there is no genuine issue of material fact as to particular claim(s) or defense(s), the court may grant summary judgment in the party's favor "upon all or any part thereof."  FRCP Rule 56(a),(b); *Beal Bank, SSB v. Pittorino*, 77 F.3d 65, 68 (1st Cir. 1999).

**B.**      **General Dynamics is Entitled to Summary Judgment Because There is No Evidence That Plaintiff was Ever Exposed to Asbestos by a Product for Which General Dynamics is Responsible**

**1.**      It is Plaintiffs' Responsibility to Show That Plaintiff Was Exposed to an Asbestos-Containing Product for Which General Dynamics is Responsible

The moving party may carry its burden of production on summary judgment either by negating an essential element of the opposing party's claim, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-160, 90 S.Ct. 1598, 1608 -1609 (1970), or showing the opposing party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden

11

of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099,

1102 (9th Circ. 2000). It is the opposing party's burden to show a triable issue of fact as to matters

on which it will bear the burden of persuasion at trial: "[a] complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Celotex Corp.*, *supra*, 477 U.S. at 323, 106 S.Ct. at 2552.

> 2.   Plaintiffs Have Failed to Provide Sufficient Evidence That Plaintiff Was Ever
>       Exposed to Asbestos From a Product for Which General Dynamics is Responsible

"Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

summary judgment motion may properly be made in reliance solely on the 'pleadings,

depositions, answers to interrogatories and admissions on file.' Such a motion, whether or not

accompanied by affidavits, will be 'made and supported as provided in this rule.'" *Celotex Corp.*,

*supra*, 477 U.S. at 317, 106 S.Ct. at 2553. "It is enough for the movant to bring up the fact that

the record does not contain such an issue and to identify that part of the record which bears out

his assertion." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.* 838 F.2d 268, 273 (8th

Cir. 1988); *Russ v. International Paper Co.* 943 F.2d 589, 592 (5th Cir. 1991).

This is exactly what General Dynamics has accomplished in the instant motion. General

Dynamics has shown that Plaintiffs have no evidence that Plaintiff was ever exposed to an

asbestos-containing product for which General Dynamics was responsible.  General Dynamics

has also shown Plaintiffs' failure to provide any evidence that any asbestos-containing materials

to which he claims exposure were manufactured, supplied or installed by General Dynamics.

Without such a showing, Plaintiffs are unable to establish liability and General Dynamics is

entitled to summary judgment.

> 3.   Without Evidence That Plaintiff Was Exposed to Asbestos From a Product for
>       Which General Dynamics is Liable, Plaintiffs Cannot Establish Causation, and
>       Thus All of their Claims Against General Dynamics Fail as a Matter of Law.

> a.   *Plaintiffs Must Prove "Threshold Exposure" to a Defendant's Allegedly
>       Defective Product Before Causation Can Be Established*

It is the plaintiff's burden in any asbestos personal injury action based on a products

liability theory to plead and prove the essential element of "causation" in order to prevail thereon.

*Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 968 (1997).  In order to satisfy this burden of

12

proving "causation," a plaintiff must "first establish some threshold exposure to the defendant's defective asbestos-containing products." *Rutherford, supra,* 16 Cal.4th at 982. If "threshold exposure" is established, it is then plaintiff's burden to establish that the exposure was a "substantial factor" in creating the risk for contracting the disease that plaintiff alleges. *Id.* at 982. In other words, a plaintiff must preliminarily establish (i.e. produce evidence) that he/she was at least exposed to a particular defendant's asbestos-containing product or to asbestos through that defendant's activities in order to prove causation. *McGonnell, supra,* 98 Cal.App.4th at 1103; *Dumin v. Owens-Corning Fiberglas Corp.* 28 Cal.App.4th 650 (1994). If plaintiff cannot produce such evidence, then no causation exists, and the plaintiff's claims against that defendant fail as a matter of law. *McGonnell, supra,* 98 Cal.App.4th at 1103; *Dumin, supra,* 28 Cal.App.4th at 655.

Although the *Rutherford* court did not expand on what satisfied "threshold exposure" to a defective asbestos-containing product, it did note that existing California cases had already addressed the matter. *Rutherford, supra,* 16 Cal.4th at 968. One such California case is *Lineaweaver v. Plant Insulation Company,* 31 Cal.App.4th 1409 (1995). In *Lineaweaver,* the court was faced with the task of determining whether the plaintiffs had presented sufficient evidence of exposure to defendants' asbestos products/activities to justify a finding that such exposure had, in fact, caused their injuries. In upholding the judgment of nonsuit, the Court held that a two-prong test was necessary in order to make its determination as to whether exposure had caused plaintiff's harm: First, a plaintiff must prove that he/she was exposed to a particular defendant's product or activity (of whatever duration), in order to establish that such exposure is a "possible" factor in causing the plaintiff's alleged asbestos-related injury. Second, if and only if plaintiff has proven such "possible" [i.e. threshold] exposure, does the court evaluate whether the exposure was a "substantial factor" in causing plaintiff's injury. *Lineaweaver, supra,* 31 Cal.App.4th at 1416.

> b.    *"Threshold Exposure" is Established With Evidence of the Time, Location, and Circumstances of the Alleged Exposure*

In *Hunter v. Pacific Mechanical Corp.,* 37 Cal.App.4th 1282, the court analyzed whether plaintiff had satisfied the first prong of *Lineaweaver;* i.e., whether he had demonstrated that there

"was a sufficient factual nexus between the negligent conduct and the injury". Finding that it was insufficient for plaintiff Hunter to merely allege, or even present evidence, that a defendant's product was at the same location at the same time as the plaintiff, the Court held that the plaintiff must produce evidence with respect to time, location, and actual circumstances of his exposure to the defendant's asbestos-related activities. *Hunter, supra,* 37 Cal.App.4th at 1290.

> c.  *Plaintiffs Do Not and Cannot Obtain Evidence to Establish "Threshold Exposure"*

Neither Plaintiffs' written discovery responses or deposition testimony provides any evidence that Plaintiff ever worked with or around General Dynamics products, much less that Plaintiff was ever exposed to any asbestos manufactured, supplied, or disturbed by General Dynamics.  Since Plaintiffs have no evidence of the specific times and/or locations, if any, when/where hazardous "exposure" to any defects for which General Dynamics might be responsible occurred, he has not and cannot establish "threshold exposure."

> d.  *Plaintiffs Cannot Establish that the Exposure Was a "Substantial Factor" in Causing Plaintiff's Injuries*

As stated, a plaintiff must establish some threshold level of exposure before the asbestos can be said to be "a substantial factor contributing to the plaintiff's risk of developing cancer." *Rutherford, supra,* 16 Cal.4th at 977.  If the plaintiff has established threshold exposure (which Plaintiffs, in this matter, have not done), the plaintiff may meet the burden of proving that there is a reasonable medical probability that a person's exposure to defendant's product was a "substantial factor" contributing to the person's risk of developing cancer. *Ibid.* A "reasonable medical probability" must be established by an expert witness.  However, in order to formulate an expert opinion to a reasonable medical probability that the plaintiff's exposure to a defendant's products exceeds the "threshold limit", the expert testimony must be based in some fact. *Wanland v. Los Gatos Lodge, Inc.,* 230 Cal.App.3d 1507, 1518 (1993) (when an expert bases his or her conclusions on assumptions not supported by the record, on matters not reasonably relied on by other experts, or on factors that are remote, speculative, or conjectural, then his or her opinion lacks evidentiary value).

In this matter, there is no evidence that Plaintiff was ever exposed to asbestos, much less asbestos manufactured or supplied by General Dynamics and/or that Plaintiff was injured by

14

asbestos designed by General Dynamics for use on its equipment.  Assuming Plaintiffs could somehow overcome these hurdles, there is no manner in which to quantify the amount of Plaintiff's exposure to any asbestos in/on General Dynamics' equipment.  Specifically, Plaintiffs' written discovery responses and deposition testimony are devoid of any information to quantify Plaintiff's exposure to asbestos for which General Dynamics is allegedly liable.   Without any manner in which to quantify the exposure, there is no foundation for any expert witness to testify that Plaintiff's exposure for which General Dynamics could be liable exceeds the threshold exposure required by *Rutherford* and *Lineaweaver*.  It is therefore impossible for Plaintiffs to establish to a "reasonable medical probability" that General Dynamics' activities were a "substantial factor" in the development of his illness.  This entitles General Dynamics to summary judgment of Plaintiffs' entire claim.

**C.** **General Dynamics is Entitled to Summary Judgment Because Its Status as a Government Contractor Immunizes it From Liability for Actions Taken at the Behest of the United States Government**

In the Federal Tort Claims Act, Congress authorized damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred. 28 U. S. C. § 1346(b). But Congress excepted "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U. S. C. § 2680(a).

According to the Supreme Court in *Boyle v. United Technologies,* 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988), "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision."

It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments, see *United States v. Varig Airlines,* 467 U.S. 797, 814 (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors

15

would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

(*Id.* at 511-12.) Contractors are therefore subject to the same immunity as the government when they operate at the government's behest. *Boyle* recognized a type of sovereign immunity for military contractors: a contractor is immune from liability when it acts in accordance with the government's discretion in situations where the government itself would be immune from liability. There is no question that "[*Boyle*] extended the exemption regarding discretionary functions of the government which is provided by the FTCA to military equipment contractors themselves." *Niemann v. McDonnell Douglas Corp.,* 721 F.Supp.1019 (S.D. Ill. 1989).

*Boyle* established a three-part test for determining whether this immunity applies. It applies when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Courts following *Boyle* have made clear that the three-part test may, and often should, be decided as a matter of law.

1.   The United States Approved Reasonably Precise Specifications for the Ships it Procured from General Dynamics

*Butler v. Ingalls Shipbuilding Co.*, 89 F.3d 582, 584 (9th Cir. 1996), defines military equipment. In *Butler*, an accommodation ladder was found to be military equipment because it was designed with the special needs of the ships it was placed upon in mind and it was actually used by military personnel to access other ships, docks and piers.

General Dynamics's ships were also necessarily designed with the special needs of the Navy in mind. All Naval vessels built or repaired by General Dynamics shipyards and subsequently accepted by the Navy would have had comply with the specifications, instructions, and guidelines found in Navy's contracts regarding this work. Thus, if any materials, equipment or parts contained asbestos aboard the vessels at issue herein, they did so pursuant to and

16

1    mandated by specific requirements of the Navy.  (See generally, Exhibits D and E.)

2         In *Niemann*, the plaintiff alleged exposure to asbestos-containing component parts,

3    including asbestos rub strips, while performing repair work to military aircraft.  The aircraft in

4    question were designed by defendants General Dynamics and McDonnell Douglas.  The

5    defendants' designs were created pursuant to MIL-G-7021, which set for the performance

6    requirements and mechanical elements of the T-29 and C-131 aircraft.  Those design

7    specifications were the result of the efforts of the Air Force Mock-Up Board who tested and

8    evaluated prototypes of these aircraft, much like the Naval Boiler and Turbine Laboratory tested

9    and evaluated marine propulsion boilers.  The defendants' design drawings were submitted and

10   approved before construction of the aircraft.

11        The plaintiff argued that the "stock product" exception to the government contractor

12   defense applied and that the specifications for the component parts were actually the

13   government's way of quoting a "stock number".  Specifically, the plaintiff cited the specification

14   for the asbestos rub strip which simply set forth the thickness and width of the strips.  The court

15   concluded that the products at issues before the court were "the aircraft themselves, and not each

16   individual component part."  The court continued:

17        It is clear that the procurement of the aircraft at issue involved a great deal more
          than merely a procurement officer contacting General Dynamics and McDonnell
18        Douglas to order a quantity of these aircraft, and that the aircraft in question were
          indeed "military equipment" and not, as plaintiff suggests, merely "stock
19        products."

20   *Niemann, supra*, 721 F.Supp.1019 at 1022.

21        It stands to reason that if military aircraft were not stock products, General Dynamics's

22   ships are not, and cannot be, stock products, either.  Indeed, the Navy designated the specific

23   model/type/manufacturer of the equipment that ship manufacturers were to use and monitored

24   compliance with its regulations.  The Navy retained ultimate decision making authority with

25   respect to the repair work and final approval of all work, including removal, repair, and

26   installation of parts and equipment aboard the submarines on which Mr. Aikins worked aboard.

27   The Navy's reasonably precise specifications for the manufacture and repair of its ships clearly

28

                                              17

1    satisfies the first prong of the *Boyle* test.

2         2.    General Dynamics' Vessels Conformed to U.S. Navy Specifications

3         *Boyle* also requires a showing that the military equipment conformed to the design

4    specifications approved by the government.  The government's acceptance and continued use of

5    equipment is itself enough to show that it conformed to government specifications.  *Niemann,*

6    *supra,* 721 F.Supp. at 1027; *see also Smith v. Xerox Corp.*, 866 F.2d 135, 139 (1989); *Yeroshefsky*

7    *v. Unisys Corp.*, 962 F.Supp. 710, 719 (1997); Exhibit E, at ¶¶ 31-34).   In the instant case, the

8    ships General Dynamics provided to the U.S. Navy conformed to the specifications approved by

9    the government, since the Navy undisputedly designed, accepted and used them.  Indeed, the U.S.

10   Navy was still using these ships a decade later when Plaintiff performed his work on them.

11   Clearly, Defendant has satisfied the second prong of the *Boyle* test.

12        3.    The Hazards of Asbestos Were Known to the United States Navy; It was a Leader
              in Researching Asbestos Health Hazards
13
          *Boyle*'s third prong requires that a supplier "warn[] the United States about the dangers in
14
     the use of the equipment *that were known to the supplier but not to the United States.*"  *Boyle,*
15
     *supra*, 487 U.S. at 511-512 [emphasis added].)  Where the government's knowledge is
16
     understood, such as in asbestos cases, it is not necessary to evaluate the supplier's knowledge:
17
              Because we conclude the Navy was already aware of the risk at issue, we need not
18            consider whether Martin-Baker would otherwise have been required to warn the
              Navy directly of the risk in order to assert successfully the military contractor
19            defense.

20   *Ramey v. Martin-Baker Aircraft Co.,* 874 F.2d 946, at n.10.

21        Courts nationwide have consistently found that the Navy had knowledge of the dangers

22   from asbestos as early as 1940.  For example, in *Shuman v. United States*, 765 F.2d 283, 285-286

23   (1st Cir. 1989), the court stated that "upper echelon Navy officials knew at least as early as 1940,

24   and probably earlier, that asbestos dust posed a significant health hazard." (*Id.* at 283.)

25        The Navy, with its Bureau of Medicine, had extensive state-of-the-art knowledge

26   concerning the potential health risks associated with exposure to asbestos.  As the medical

27   knowledge increased with time, Navy requirements changed to stay abreast of the danger as it

28   was understood.  The Navy took aggressive action in dealing with the health risks of asbestos – it

                                              18

was an industrial leader in doing so.  The Navy conducted its own training, adopted its own precautionary measures and provided its own warnings where such warnings were deemed appropriate.  It even issued its own instructions regarding the handling of asbestos.  (See Exhibit D, at ¶¶ 24-28).  There can be no doubt that the Navy's awareness of the dangers associated with asbestos exposure far exceeded that of General Dynamics.  Since the Navy's knowledge of such dangers is indisputable, General Dynamics owed no duty to warn the Navy of these dangers.  This satisfies the third prong of the *Boyle* test and entitles General Dynamics to summary judgment as a government contractor as a matter of law.

**D.      The United States Navy was a Sophisticated User of Asbestos**

*Johnson v. American Standard, Inc.*, 43 Cal.4th 56 (2008), has recognized and adopted the sophisticated user defense in California.  *Id.* at 61, 70.  It found persuasive the reasoning of *In re Related Asbestos Cases*, 543 F.Supp. 1142 (N.D. Cal, 1982), which discussed application of a "sophisticated user" defense based on the Navy as a purchaser. *Johnson, supra*, 43 Cal.4th at 69.  The sophisticated user defense acknowledges the superior ability of sophisticated purchasers and employers to warn and protect others from product-related injury. *Id.* at 61.  It creates an exception to the manufacturer's general duty to warn consumers and acts as an affirmative defense to negate the manufacturer's duty to warn. *Ibid.* The defense is specifically applicable where a purchaser or user of a product, or the employer of individuals working on or around the product, knew or should have known of a potential hazards and protected plaintiff or others from those hazards. *Johnson, supra*, 43 Cal.4th at 61.  See Rest.2d Torts, § 402A.  This is because the user's knowledge of the dangers is the equivalent of prior notice. *Ibid.* The defense is applicable to both negligence and strict liability causes of action. *Id.* at 71.  "The rationale supporting the defense is that 'the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers.' [Citation.]" *Johnson, supra*, 43 Cal.4th at 65 [emphasis added].

In the instant case, there is no question that the Navy had both a sophisticated knowledge

19

1  of asbestos' hazards and should have known of any hazards that might have been associated with

2  its use of products.  As demonstrated by both Admiral Horne and Admiral Sargent, the Navy

3  maintained superior knowledge regarding the hazards of asbestos.  *See also, In re Eastern and*

4  *Southern Districts Asbestos Litigation* 772 F. Supp. 1380, 1384 (E.D.N.Y. 1991) ("[t]he Navy,

5  though aware of the hazards posed by asbestos dust, in its urge to build its warships as quickly as

6  possible, did not inform workers of the dangers and neglected to take available protective

7  precautions"); *Niemann, supra,* 721 F. Supp. at 1019 (finding government contractor defense

8  applicable to bar recovery in part because "the government was aware of the risks of the use of

9  asbestos and chose to continue to use it despite this knowledge").

10  **E.**   **Plaintiffs Have Not Provided Any Evidence Showing That He Is Entitled To Punitive Damages In This Action**

11

12           Punitive damages may only be awarded for conduct that is outrageous, either because of

13  the defendant's evil motive or his reckless indifference to the rights of others.  *Smith v. Wade,* 461

14  U.S. 30, 46-47; 103 S. Ct. 1625; 75 L. Ed. 2d 632 (1983).  General Dynamics is entitled to partial

15  summary judgment of Plaintiff's claim for punitive damages because Plaintiff has not provided

16  any evidence of its reckless indifference, malice, or oppression.  Courts grant partial summary

17  judgment of punitive damages when plaintiffs show "no evidence of record demonstrating that

18  any of the Defendants' conduct was motivated by "evil motive or intent, or involves reckless or

19  callous indifference to federally protected rights.'"  *Schroeder v. San Diego Unified Sch. Dist.,*

20  2009 U.S. Dist. LEXIS 40422 at *45 (2009).  Since Plaintiff has not made such a showing in this

21  case, this Court should grant partial summary judgment with regard to the prayer for punitive

22  damages.

**IV.**
**CONCLUSION**

23

24           For the foregoing reasons, General Dynamics respectfully requests that this Court grant its

25  motion for summary judgment and dismiss all of Plaintiff's claims against Defendant with

26  prejudice.

27

28

POINTS AND AUTHORITIES SUPPORTING GENERAL DYNAMICS CORPORATION MSJ/MSA

1    Dated:  October 5, 2011                         JACKSON JENKINS RENSTROM LLP

2

3                                                    By:  _s/ James J. O'Brien_____
                                                         JAMES J. O'BRIEN
4                                                        Attorneys for Defendant
                                                         GENERAL DYNAMICS CORPORATION
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POINTS AND AUTHORITIES SUPPORTING GENERAL DYNAMICS CORPORATION MSJ/MSA

1

2

**CERTIFICATE OF SERVICE**

3        The undersigned, counsel for GENERAL DYNAMICS, hereby certifies that a true and

4    correct copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN

5    SUPPORT OF DEFENDANT GENERAL DYNAMICS CORPORATION CORPORATION'S

6    MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY

7    ADJUDICATION OF CERTAIN ISSUES was filed with the Court electronically on October 5,

8    2011 and made available for viewing and downloading through the CM-ECF (Electronic Case

9    Filing) system to all counsel of record who are registered to receive a Notice of Electronic Filing

10   for this case.  This document was served via United States Postal Service regular mail to those

11   counsel of record not registered with CM-ECF on October 5, 2011.

12

13                             /s/ Jill Harvey_____

14                           Jill Harvey

15

16

17

18

19

20

21

22

23

24

25

26

27

28